**Robert BERNARD, Plaintiff-Appellant,**

v.

**BINNINGS CONSTRUCTION CO., INC.,
Defendant-Appellee.**

No. 84–3018
**Summary Calendar.**

United States Court of Appeals,
Fifth Circuit.

Sept. 17, 1984.

Before RUBIN, RANDALL and TATE, Circuit Judges.

RANDALL, Circuit Judge:

This appeal presents two questions that have been frequently litigated in this Circuit: (1) what constitutes a "vessel" for Jones Act purposes and (2) under what circumstances can the issue of a structure's status as a Jones Act vessel be removed from the trier of fact and decided as a matter of law? Robert Bernard (Bernard) sued his employer, Binnings Construction Company, Inc. (Binnings), under the Jones Act, 46 U.S.C. § 688, for injuries to his back allegedly sustained while Bernard was engaged in pile driving activities along the New Basin Canal near Lake Pontchartrain, Louisiana. At the time of the accident, Bernard was working from a small raft or "work punt" stationed alongside a piling that was being driven near the shore of the canal. The district court granted summary judgment dismissing Bernard's suit on the ground that Bernard is not a Jones Act seaman, finding as a matter of law that the work punt upon which Bernard was working at the time of his injuries is not a vessel. The sole issue raised in this appeal is whether the district court erred in concluding that, as a matter of law, the work punt is not a Jones Act vessel. Finding no error in the district court's conclusion, we affirm.

Robert B. Schambach, Metairie, La., for plaintiff-appellant.

Henderson, Hanemann & Morris, Carlos E. Lazarus, Jr., Houma, La., for defendant-appellee.

I. Factual Background.

The underlying facts are not in dispute.[1] At the time of Bernard's injuries, Binnings was engaged in driving "sheet pilings"[2] for a condominium project located on the New Basin Canal. The New Basin Canal is a small canal used primarily by recreational

---

1. Binnings filed a "Statement of Uncontested Material Facts" with its Motion for Summary Judgment. For purposes of resolving the work punt's status, Bernard has agreed with Binnings' statement of the facts. (See Bernard's Memorandum in Opposition to Motion for Summary Judgment at p. 1). In addition, the record contains Bernard's deposition.

2. Although the record is not entirely clear on this point, sheet pilings are apparently interlocking metal piles which, on this project, formed part of a flood wall over which the condominiums were to be constructed.

craft and is not large enough for commercial vessels. Bernard's job consisted of guiding sheet pilings into place as they were lowered into position by men working from the shore. Bernard was sometimes required to break cement from around existing pilings in order to clear the way for new sheet pilings, a task he accomplished by swinging a flat-headed maul. He performed his duties from the water side of the pilings, while standing on a small raft or work punt.[3] Bernard maneuvered himself into the proper position to accomplish his work by paddling the work punt around the pilings.[4] At the time of his injuries, Bernard had been employed in this capacity for approximately three weeks and worked exclusively on the work punt during that period.[5]

The work punt is a flat, iron platform measuring sixteen feet long by four feet wide, square at both ends, with a tank at each end and in the middle for buoyancy. It is eighteen inches deep and has no deck or crew quarters, no navigational lights and no means of self-propulsion other than the paddle that Bernard kept on board. The parties have stipulated that " '[t]he work punt' was used solely as a small platform from which to break the cement and guide the sheet pilings." (Statement of Uncontested Material Facts No. 11).

Bernard injured his back when he fell while swinging a maul to clear cement from around an old piling. At the time of the fall, he was standing with one foot on the work punt and one foot on a brace connecting two pilings to which he was "tied." [6]

## II. Contentions of the Parties.

Binnings moved for summary judgment on these undisputed facts, claiming that Bernard was not a seaman at the time of his injuries. Binnings' position is premised on the proposition that, as a matter of law, the work punt is not a Jones Act vessel. The district court granted the motion for summary judgment and dismissed the case.[7]

---

3. Bernard refused to characterize the boat as a work punt during his deposition, but referred to it as a "flat boat" or "work boat." (*See* Deposition of Robert Bernard, Oct. 10, 1983 at pp. 14–15). His Memorandum in Opposition to Motion for Summary Judgment, however, refers to the boat as a work punt.

4. The record does not disclose how far from shore the pilings were being driven or how much distance existed between each piling. In addition, it is not clear whether Bernard simply paddled the work punt to change his position around individual pilings, but moved from piling to piling on shore, or whether he also used the work punt to travel between pilings. The record is also silent as to whether the work punt was tied to pilings when Bernard was paddling himself about the work area. These unanswered questions, however, do not prevent us from affirming the district court's summary judgment. *See* Part IV, *infra.*

5. Because we conclude that the work punt is not a vessel, we express no opinion as to whether this tenure would satisfy the "permanent assignment" or "contribution to the function or mission of a vessel" prongs of the Jones Act seaman test.

6. Bernard testified by deposition as follows:
 QUESTION (from counsel for Binnings): What were you standing on [at the time of the fall]?

ANSWER: I had one foot in the boat and one foot on the brace.
 QUESTION: The brace meaning one of the pilings?
 ANSWER: It was a brace tied to two pilings that I was tied to.
Deposition of Robert Bernard, Oct. 10, 1983 at pp. 30–31. Although this testimony does not make clear whether it was the work punt or Bernard's person that was tied to the pilings, we think it supports only one rational inference: the work punt was secured to an immovable object at the time of the accident and was not floating freely in the canal. *See* Part IV, *infra.*

7. Although the hearing on Binnings' Motion for Summary Judgment was rather truncated, the court indicated that its decision was based on Bernard's lack of seaman status. Said the court:
 It [the work punt] may meet some of the technical definition languages used in some of the cases but I can't imagine it and I simply refuse to go through the gymnastics that are necessary. There was no way he was a seaman. I mean it [the Jones Act] just could not have been intended to cover a thing of this type.
Record Vol. II at p. 2. Despite the district court's refusal to go through the necessary "gymnastics," we are satisfied that the record is sufficiently complete to support the summary judgment.

On appeal, Bernard relies on the familiar rule that Jones Act seaman status is generally determined by the trier of fact and that even marginal Jones Act claims should be submitted to the jury. Binnings, on the other hand, argues that the work punt's primary function is to provide a work platform and that it therefore falls within that class of structures, analogous to floating dry docks, that we have held are not vessels as a matter of law.

### III. The Applicable Law.

#### A. Is Summary Judgment Available on Seaman Status?

 The benefits of the Jones Act[8] are available only if the claimant qualifies as a seaman. The burden of establishing seaman status is, of course, on the party claiming the benefits to be derived therefrom. *See, e.g., Billings v. Chevron, U.S.A., Inc.,* 618 F.2d 1108, 1109 (5th Cir. 1980) ("In order to establish Jones Act jurisdiction, plaintiff must show that at the time of his injury he was a seaman on a vessel ...."). Although the Jones Act itself does not define the term seaman, the test of seaman status is firmly established by our decisions. Although the test has been phrased with slight variations from case to case,[9] it is clear that, in order to qualify for coverage under the Jones Act, a worker claiming seaman status must satisfy the following criteria:

(1) he must have a more or less permanent connection with (2) a vessel in navigation and (3) the capacity in which he is employed or the duties which he performs must contribute to the function of the vessel, the accomplishment of its mission or its operation or welfare in terms of its maintenance during its movement or during anchorage for its future trips. *Barrios v. Engine & Gas Compressor Services, Inc.,* 669 F.2d 350, 352 (5th Cir.1982). *See also Watkins v. Pentzien, Inc.,* 660 F.2d 604, 606 (5th Cir.1981), *cert. denied,* 456 U.S. 944, 102 S.Ct. 2010, 72 L.Ed.2d 467 (1982).

██ Seaman status is ordinarily a question for the trier of fact. *Longmire v. Sea Drilling Corp.,* 610 F.2d 1342, 1345 (5th Cir.1980).[10] As we said in *Offshore Co. v. Robison,* 266 F.2d 769 (5th Cir.1959):

Even where the facts are largely undisputed, the question at issue [of seaman status] is not solely a question of law when, because of conflicting inferences that may lead to different conclusions among reasonable men, a trial judge cannot state an unvarying rule of law that fits the facts.

*Id.* at 780. Therefore, we have long held that the question of seaman status should only be removed from the trier of fact (by summary judgment or directed verdict) in rare circumstances and that even marginal Jones Act claims should be submitted to the jury. *See, e.g., Leonard v. Exxon Corp.,* 581 F.2d 522, 524 (5th Cir.1978), *cert. denied,* 441 U.S. 923, 99 S.Ct. 2032, 60 L.Ed.2d 397 (1979) ("[S]ubmission of

---

**8.** The Jones Act, 46 U.S.C. § 688, provides:

Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply; and in case of the death of any seaman as a result of any such personal injury the personal representative of such seaman may maintain an action for damages at law with the right of trial by jury, and in such action all statutes of the United States conferring or regulating the right of action for death in the case of railway employees shall be applicable. Jurisdiction in such actions shall be under the court of the district in which the defendant employer resides or in which his principal office is located.

**9.** "All of these formulations [of the seaman test] express basically the same idea ...." *Bouvier v. Krenz,* 702 F.2d 89, 91 (5th Cir.1983).

**10.** We have alternatively characterized the question of seaman status as "a mixed question of law and fact," *Holland v. Allied Structural Steel Co.,* 539 F.2d 476, 479 (5th Cir.1976), *cert. denied,* 429 U.S. 1105, 97 S.Ct. 1136, 51 L.Ed.2d 557 (1977), and a question "whose resolution requires the application of legal principles to specific underlying facts about what the parties did or did not do." *Ardoin v. J. Ray McDermott & Co.,* 641 F.2d 277, 280 (5th Cir.1981).

Jones Act claims to a jury requires a very low evidentiary threshold; even marginal claims are properly left for jury determination.").

■ It is equally clear from our decisions, however, that the concern of *Robison* and its progeny, that seaman claims should ordinarily be decided by the trier of fact, does not automatically preclude summary judgment on the issue of Jones Act jurisdiction. *See, e.g., Thibodeaux v. J. Ray McDermott & Co.*, 276 F.2d 42, 46 (5th Cir.1960) (*Robison* does *not* "perforce make every case [of seaman status] one of fact for jury decision.").[11] Summary judgment is proper on the question of seaman status where the underlying facts are undisputed and the record reveals no evidence from which reasonable persons might draw conflicting inferences on any of the elements of the seaman test. *Ardoin v. J. Ray McDermott & Co.*, 641 F.2d at 280; *Stanley v. Guy Scroggins Construction Co.*, 297 F.2d 374, 376 (5th Cir.1961). In

other words, summary judgment on seaman status is proper "where the only rational inference to be drawn from the evidence is that the worker is not a seaman." *Beard v. Shell Oil Co.*, 606 F.2d 515, 517 (5th Cir.1979). *See also Owens v. Diamond M Drilling Co.*, 487 F.2d 74, 76 (5th Cir.1973).[12] Where the facts upon which summary judgment on seaman status is based are, as here, undisputed, our job is to "review them to determine whether reasonable persons might draw conflicting inferences." *Bertrand v. International Mooring & Marine, Inc.*, 700 F.2d 240, 244 (5th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 974, 79 L.Ed.2d 212 (1984).

## B. What is a Jones Act Vessel?

■ The existence of a vessel, as a fundamental prerequisite to Jones Act jurisdiction, is central to the test of seaman status. The term vessel has generally been defined broadly[13] and, in its traditional sense, refers to structures designed or utilized for

11. In fact, we have recently recognized that with regard to the allocation of the adjudicative function between judge and jury, the question of seaman status is no different from other factual determinations in which the ultimate determination is intimately related to the application of legal principles to specific underlying facts about what the parties did or did not do.
*Longmire v. Sea Drilling*, 610 F.2d at 1345.

12. We have not been reluctant, in appropriate cases, to affirm the grant of summary judgment on various elements of the test of seaman status. *See, e.g., Bouvier v. Krenz*, 702 F.2d at 89 (affirming summary judgment for lack of "permanency or substantiality" in relationship to vessels); *Stansbury v. Sikorski Aircraft*, 681 F.2d 948 (5th Cir.), *cert. denied,* 459 U.S. 1089, 103 S.Ct. 573, 74 L.Ed.2d 935 (1982) (affirming summary judgment for lack of vessel in navigation); *Barrios v. Engine & Gas Compressor Serv.*, 669 F.2d at 350 (affirming summary judgment for lack of vessel); *Guidry v. Continental Oil Co.*, 640 F.2d 523 (5th Cir.), *cert. denied,* 454 U.S. 818, 102 S.Ct. 96, 70 L.Ed.2d 87 (1981) (affirming summary judgment for lack of permanent assignment or performance of substantial part of duties on vessel); *Billings v. Chevron, U.S.A.*, 618 F.2d at 1108 (affirming summary judgment for lack of permanent assignment to vessel in navigation); *Longmire v. Sea Drilling*, 610 F.2d at 1342 (affirming summary judgment for want of permanent assignment); *Smith v. Massman*

*Constr. Co.*, 607 F.2d 87 (5th Cir.1979) (affirming summary judgment for lack of vessel); *Leonard v. Exxon*, 581 F.2d at 522 (affirming summary judgment for want of vessel); and *Atkins v. Greenville Shipbuilding Corp.*, 411 F.2d 279 (5th Cir.), *cert. denied,* 396 U.S. 846, 90 S.Ct. 105, 24 L.Ed.2d 96 (1969) (affirming summary judgment for lack of vessel in navigation).

13. The term is defined by Section 1 of the Shipping Act of 1916, 46 U.S.C. § 801, as follows:
 The term "vessel" includes all water craft and other artificial contrivances of whatever description and at whatever stage of construction, whether on the stocks or launched, which are used or are capable of being or are intended to be used as a means of transportation on water.
 Some of our decisions contain broad definitions which could conceivably encompass the work punt involved in this case. *Compare Offshore Co. v. Robison*, 266 F.2d at 771 ("almost any structure that once floated or is capable of floating on navigable waters") *with Burks v. American River Transp. Co.*, 679 F.2d 69, 75 (5th Cir.1982) ("No doubt the three men in a tub would also fit within our definition, and one probably could make a convincing case for Jonah inside the whale."). Placed in context, however, our decisions make clear that the mere capacity to float or move across navigable waters does not necessarily make a structure a vessel for Jones Act purposes. *See notes 17, 19, infra.*

"transportation of passengers, cargo or equipment from place to place across navigable waters." *Cook v. Belden Concrete Products, Inc.,* 472 F.2d 999, 1002 (5th Cir.), *cert. denied,* 414 U.S. 868, 94 S.Ct. 175, 38 L.Ed.2d 116 (1973). *See also* A. Sann, 1B Benedict on Admiralty § 11a (7th ed. 1983) ("structure which carries cargo or passengers across the water"). We have been careful to note, however, that the term vessel is not capable of precise definition.[14] We have, for example, upheld determinations that a variety of special purpose structures, far removed from the conventional notion of ships and seagoing barges, are Jones Act vessels.[15] In evaluating a structure's status, we consider "the purpose for which the craft is constructed and the business in which it is engaged." *Blanchard v. Engine & Gas Compressor Services Inc.,* 575 F.2d 1140, 1142 (5th Cir. 1978) (citing *The Robert W. Parsons,* 191 U.S. 17, 30, 24 S.Ct. 8, 12, 48 L.Ed. 73 (1903)). *See also Hicks v. Ocean Drilling & Exploration,* 512 F.2d at 817.

We note at the outset that the size of the structure,[16] its ability to float,[17] the permanence of its fixation to the shore or bottom,[18] and the fact of its movement or its capability of movement across navigable waters [19] are not conclusive of vessel status.

We note also that a structure whose purpose or primary business is *not* navigation or commerce across navigable waters may nonetheless satisfy the Jones Act's vessel requirement if, at the time of the worker's injury, the structure was actually engaged in navigation. *See, e.g., Blanchard v. Engine & Gas Compressor Services,* 575 F.2d at 1143 n. 5 (building mounted on submerged barge not vessel as a matter of law, but "[o]ur holding might be different if Blanchard had been injured while the structures were being floated into position"); *Cook v. Belden Concrete Products,* 472 F.2d at 1002 ("Although the floating construction platform was not designed for the purpose of navigation, the structure might be classified as a vessel ... if at the time of appellant's injury it had actually been engaged in navigation.").[20]

From these established principles of law, it appears that the district court's summary judgment in this case was proper only if reasonable persons could not have concluded from the undisputed facts before the court that the work punt was designed or used primarily for the transportation of cargo, equipment or persons across navigable waters or was, at the time of Bernard's injuries, engaged in navigation.

## IV. The Work Punt's Status.

Binnings argues that, except for its size, the work punt is indistinguishable

---

**14.** Attempts to fix unvarying meanings hav[ing] a firm legal significance to such terms as "seaman", "vessel", "member of a crew" must come to grief on the facts. *Offshore Co. v. Robison,* 266 F.2d at 779.

**15.** *See, e.g., Hicks v. Ocean Drilling & Exploration Co.,* 512 F.2d 817 (5th Cir.1975), *cert. denied sub nom. Hughes v. Ocean Drilling & Exploration Co.,* 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 639 (1976) (affirming jury determination that submersible oil storage facility is vessel); *Producers Drilling Co. v. Gray,* 361 F.2d 432 (5th Cir.1966) (affirming directed verdict that submersible drilling barge is vessel); *Offshore Co. v. Robison,* 266 F.2d at 769 (affirming jury verdict that mobile drilling platform with retractable legs is vessel).

**16.** *E.g., Stallworth v. McFarland,* 350 F.Supp. 920 (W.D.La.1972) (fourteen foot aluminum boat propelled by outboard motor), *aff'd per curiam,* 493 F.2d 1354 (5th Cir.1974).

**17.** *E.g., Blanchard v. Engine & Gas Compressor Serv.,* 575 F.2d at 1143 ("[m]ere flotation on water does not constitute a structure a 'vessel' ") (quoting *Cook v. Belden Concrete Products,* 472 F.2d at 1001).

**18.** *E.g., Cook v. Belden Concrete Products,* 472 F.2d at 1001 ("the permanence of fixation, however, is not the criterion").

**19.** *Id.* at 1002 ("However, capability to sustain such movement has been held insufficient to establish that such craft are constructed for the purpose of navigation.").

**20.** One court has characterized such a structure as a "sometime vessel." *Percle v. Western Geophysical Co. of America,* 528 F.Supp. 227, 230 (E.D.La.1981) ("marsh buggy" not a Jones Act vessel unless actually travelling in navigable stream at time of accident).

from the larger dry docks and work platforms we have previously found unqualified for Jones Act treatment. Bernard, on the other hand, argues that the work punt at least presents a marginal case for vessel status and that its character should be determined by the jury. Our decisions establish that dry docks and analogous structures whose primary purpose is to provide a work platform, even if the structures are afloat, are not Jones Act vessels as a matter of law.[21] We have not previously been called upon to apply these decisions to a small, raft-like structure, like the work punt involved in this appeal, that, although frequently moved around a work area, functions primarily as a work platform.[22]

In *Atkins v. Greenville Shipbuilding*, 411 F.2d at 279, we held that, for purposes of the maritime warranty of seaworthiness attaching to vessels in navigation,[23] a floating dry dock is not a vessel as a matter of law. Atkins was injured when a ladder slipped, causing him to fall to the dry dock's floor. The dry dock was a "large flat surface," floating on, but permanently affixed to the shore of, Lake Ferguson, Mississippi. It had no motive power and could only be moved by towing or by the application of other external force. *Id.* at 280. In affirming the district court's summary judgment that the dry dock was not a vessel, we held that:

> Mere flotation on water does not constitute a structure a "vessel" for purposes

of salvage nor warranty of seaworthiness. The element of risk and exposure to the hazards of the sea, necessary for the operation of and common to both principles, is absent upon floating drydocks.

*Id.* at 283 (citing *Cope v. Vallette Dry-Dock Co.*, 119 U.S. 625, 7 S.Ct. 336, 30 L.Ed. 501 (1887) (dry dock not a vessel for salvage purposes)). *See also Chahoc v. Hunt Shipyard*, 431 F.2d 576, 577 (5th Cir.1970), *cert. denied*, 401 U.S. 982, 91 S.Ct. 1198, 28 L.Ed.2d 333 (1971) ("[A] floating dry dock [is] not a 'vessel' while moored to the bank and operated as a dry dock."). In *Keller v. Dravo Corp.*, 441 F.2d 1239 (5th Cir.1971), *cert. denied*, 404 U.S. 1017, 92 S.Ct. 679, 30 L.Ed.2d 665 (1972), we affirmed summary judgment that a floating dry dock *"moored and in use as a dry dock"* (emphasis in original) is not a vessel, in the face of conflicting affidavit evidence regarding whether the dock was equipped with navigational aids and the frequency with which it was moved across navigable waters. *Id.* at 1244. In a line of cases beginning with *Cook v. Belden Concrete Products*, 472 F.2d at 999, we have extended that rationale, by analogy, to structures that lack the permanency of fixation to shore or the bottom that is common to dry docks, but nonetheless are used primarily as work platforms. The analogy to dry docks has been found suffi-

---

21. *See, e.g., Atkins v. Greenville Shipbuilding*, 411 F.2d at 279 (floating dry dock); *Cook v. Belden Concrete Products*, 472 F.2d at 999 (floating construction platform).

22. Other courts have addressed the vessel status of such structures. *E.g., Powers v. Bethlehem Steel Corp.*, 477 F.2d 643 (1st Cir.), *cert. denied*, 414 U.S. 856, 94 S.Ct. 160, 38 L.Ed.2d 106 (1973) (raft or float used as platform for cleaning pilings); *Fleming v. Port Allen Marine Serv., Inc.*, 552 F.Supp. 27 (M.D.La.1982) (floating work flat used as a place to stand while repairing ships); *Mayfield v. Wall Shipyard, Inc.*, 510 F.Supp. 605 (E.D.La.1981) (pontoon float used as work platform for ship repair); *Berfect v. American Commercial Barge Lines*, 509 F.Supp. 734 (E.D.La. 1981) (work flat used as platform for ship repair); *Buna v. Pacific Far East Line*, 441 F.Supp. 1360 (N.D.Cal.1977) (paint float used as platform for painting ship hulls).

We of course do not hold that small boats and rafts can never be Jones Act vessels. *See, e.g., Stallworth v. McFarland*, 350 F.Supp. at 920 (fourteen foot aluminum boat, propelled by outboard motor, used to clean boat lanes on lake; accident occurred while travelling to landing at end of work day); *Luckett v. Continental Eng'g Co.*, 649 F.2d 441 (6th Cir.1981) (sixteen foot flat-bottom boat, powered by outboard motor; used to transport survey crew up and down river and, occasionally, to sound the river).

23. *See Reed v. The Yaka*, 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448 (1963). Decisions of vessel status for the warranty of seaworthiness apply equally to Jones Act jurisdiction disputes. *See, e.g., Hebert v. Air Logistics, Inc.*, 720 F.2d 853 (5th Cir.1983).

ciently close to support determination of vessel status as a matter of law even in cases where the structures were moved across navigable waters on a fairly regular basis, but where their transportation function was purely incidental to their purpose of providing a work platform. For example, in *Cook* we affirmed a summary judgment dismissing Cook's Jones Act suit against his employer for injuries sustained while working on a floating construction platform moored alongside the employer's concrete yard. We found the construction platform "legally indistinguishable from a floating dry dock" and held that, as a matter of law, it was not a Jones Act vessel. *Id.* at 1000. The construction platform consisted of a flat-deck barge (180 feet long by 54 feet wide) secured to a dock by ropes. It lacked motive power and was moved, when necessary, by tug boats or land-based cranes. The platform was utilized as a station for the construction of concrete barges. Unlike a dry dock, however, it was "occasionally ... moved to different positions alongside the defendant's dock to pick up materials" and was regularly towed a short distance into deeper water to launch completed barges that had been constructed upon its work surface. *Id.* We concluded, however, that as a matter of law the construction platform was not a Jones Act vessel.[24]

Since *Cook* we have, despite our reluctance to take Jones Act claims from the trier of fact, affirmed findings that, as a matter of law, other floating work platforms are not vessels. A review of these decisions indicates three factors common to them: (1) the structures involved were constructed and used primarily as work platforms; (2) they were moored or otherwise secured at the time of the accident; and (3) although they were capable of movement and were sometime moved across navigable waters in the course of normal operations, any transportation function they performed

was merely incidental to their primary purpose of serving as work platforms. For example, in *Leonard v. Exxon*, 581 F.2d at 522, we affirmed summary judgment denying seaman status to a worker injured on a floating construction platform moored to the bank of the Mississippi River and used for the construction of an underwater pipeline. The platform consisted of four barges, three of which were positioned end to end with the fourth located between the other three and the shore. The fourth barge was used as a crane platform and, in order for the crane to reach its work on the other barges, the three-barge platform was occasionally untied and moved forward or backward until properly positioned. In addition, the barges were utilized to transport pipelines constructed upon their work surface a short distance across navigable waters to their proposed locations. *Id.* at 525 (Godbold, J., dissenting). The platform was not self-propelled and was moved by the application of external force. We found, over Judge Godbold's dissent arguing that the barges were utilized for a function performed by traditional vessels— the transportation of cargo (the completed pipeline) over navigable waters—that the barges' status was controlled by *Cook* and that the transportation function of the barges was incidental to their primary purpose. *See also Smith v. Massman Construction*, 607 F.2d at 87 ("caisson" or large topless steel box, 200 feet by 84 feet, secured by cables to bank, designed to become part of bridge pier and also used for incidental transport of men and equipment across navigable waters); *Fox v. Taylor Diving & Salvage*, 694 F.2d at 1349 (nonnavigable chamber used to create air-tight environment for underwater welding); *Blanchard v. Engine & Gas Compressor Services*, 575 F.2d at 1140 (compressor building mounted on submersible barges).

We have no difficulty concluding that the work punt's status is controlled by *Cook's*

---

**24.** We applied the "purpose for which constructed" and "business in which engaged" test, *see* Part III, B, *supra*, and had little difficulty concluding that the platform, despite that "in the normal course of its service, [it was] towed from point-to-point in ... navigable waters," was not designed for navigation or actually engaged in navigation at the time of Cook's injury. *Id.* at 1001.

analogy to floating dry docks. The undisputed evidence supports only one rational inference: the work punt was not designed for navigation,[25] was not engaged in the business of navigation, and was not actually in navigation at the time of Bernard's injuries. The work punt lacks all indicia of a structure designed for navigation; it has no raked bow, no means of self-propulsion, and no crew quarters or navigational lights.[26] The parties have stipulated that the work punt was used solely as "a small work platform."[27] In short, we find no evidence from which a trier of fact could reasonably have concluded that the work punt's primary purpose, design or business was other than to provide a work platform.

The record does not reveal the full details of the work punt's movement around the New Basin Canal.[28] For example, we do not know how far the work punt actually travelled or whether it was tied to the shore during its movement. Having concluded, however, that the work punt's primary purpose and business was to provide a work platform, these unanswered questions do not prevent us from affirming the district court's summary judgment. The parties' stipulation that the work punt was used solely as small work platform strongly suggests that Bernard's use of the work punt as a means of transportation, if any, was minimal. At any rate, our decisions make clear that a structure whose primary function is to serve as a work platform

does not become a vessel even if it sometimes moves significant distances across navigable waters in the normal course of operations.[29] We have no difficulty in concluding that the record could not support an inference that the work punt's transportation function, if any, was sufficient to make it a Jones Act vessel. The stipulation that the work punt was used solely as a work platform negates any inference that it was also used for significant transportation functions. The transportation of Bernard around his work stations does not approach the regular delivery activities we found in *Cook* and *Leonard* to be "incidental" as a matter of law.

The record likewise could not support an inference that the work punt was actually engaged in navigation at the time of Bernard's injuries. Bernard testified that he was "tied" to two pilings at the time of the accident and that he had one foot on a brace connecting the pilings.[30]

We find that the work punt is analogous to a floating dry dock. Its primary function is to serve as a work platform and any transportation function it may have performed is incidental to that purpose. Moreover, it was secured to pilings and not actually engaged in navigation at the time of the accident.[31] Therefore, the work punt is not a Jones Act vessel as a matter of law.

---

**25.** We are rarely presented with direct evidence of the subjective purpose motivating the designer or builder of a floating structure. Rather, we have generally looked to whether the structure has certain objective features the existence of which suggests that its intended purpose was transportation across navigable waters. These features include: (1) navigational aids; (2) raked bow; (3) lifeboats and other lifesaving equipment; (4) bilge pumps; (5) crew quarters; and (6) registration as a vessel with the Coast Guard. *See, e.g., Smith v. Massman Constr.*, 607 F.2d at 88; *Blanchard v. Engine & Gas Compressor Serv.*, 575 F.2d at 1143.

**26.** Statement of Uncontested Material Facts Nos. 9, 10.

**27.** Statement of Uncontested Material Fact No. 11.

**28.** *See* note 4, *supra.*

**29.** *See, e.g., Cook*, 472 F.2d at 999 (delivery of completed barges); *Leonard*, 581 F.2d at 522 (delivery of completed pipelines).

**30.** *See* note 6, *supra.*

**31.** We, of course, do not hold that a worker injured on a structure secured to the shore or bottom is automatically precluded from Jones Act recovery. *See, e.g., Cook v. Belden Concrete Products*, 472 F.2d at 1001 ("Conventional ships and barges ... retain [vessel] status even while moored, dry-docked, or otherwise immobilized and secured to land."). We simply hold, following *Cook* and its progeny, that a work platform that has an incidental transportation function but is secured at the time of injury is not a Jones Act vessel.

We note that other courts considering the status of structures similar to the work punt have reached the same conclusion. For example, in *Powers v. Bethelhem Steel*, 477 F.2d at 643, the First Circuit affirmed judgment notwithstanding the verdict that a work float is not a Jones Act vessel. Powers was injured while standing on a work float used as a platform from which workers cleaned and poured concrete around the piles of shipyard's pier. The work float consisted of a raft, twenty-five feet long by five feet wide, constructed of timbers bonded together. It was attached to the pier by ropes. Workers descended to the float by ladder and "move[d] the raft under the pier to the piles by poling or pulling on lines attached to the pier." *Id.* at 645. During the process of moving the float from pile to pile, it may have become unattached and free-floating for short periods. *Id.* at 645 n. 1. Citing our decision in *Cook*, the First Circuit found that, since the work float's primary purpose was to provide a work platform and its movement was incidental to its intended use, it was "indistinguishable from a permanent floating dock." *Id.* at 647.[32]

We also have no difficulty distinguishing the case *sub judice* from those marginal cases that we have sent to the trier of fact. In *Brunet v. Boh Brothers Construction*, 715 F.2d 196 (5th Cir.1983), for example,

Brunet was injured aboard a pile-driving barge consisting of several "interlocking flexi-float platforms." It carried a 150 ton crane and was designed and regularly used to transport the crane "across navigable waters to job sites that cannot be reached by land-based pile-drivers." *Id.* at 198. Although moored at the time of the accident, it had been moved to four different job sites within the Gulf Coast area in the six months preceding the accident. In *Brunet*, we reversed summary judgment denying seaman status to the injured worker, refusing to characterize the barge's transportation function as incidental as a matter of law. We remanded the case, holding that "the question whether the barge is a Jones Act vessel was integral to the jury question of seaman status." *Id.* at 199.

We find *Brunet*'s pile-driving barge distinguishable from the work punt. The parties in the instant case have stipulated that the work punt was used "solely" as a work platform. In *Brunet*, on the other hand, the summary judgment evidence indicated that the barge was used as a work platform and was both designed and used on a "fairly regular basis" to transport the crane around the Gulf of Mexico. Therefore, the *Brunet* record, like that in other "special use" cases, could have supported the inference that the barge was designed or used primarily for navigation.[33] A simi-

---

**32.** We are not unmindful of the factual differences between *Powers* and the instant case. In *Powers,* the work float was attached to the pier at the time the workers boarded it. The record clearly established that its only movement was between pilings and that, during that movement, it was normally, though not always, attached to the pier by at least one rope. *Id.* at 645. The record in the instant case, on the other hand, does not reveal with similar detail the full extent of the work punt's movement. *See* note 4, *supra.* We are convinced, however, that the record could not support the inference that the work punt's transportation function was anything but incidental.

A district court has reached a similar conclusion about a structure analogous to the work punt, even where the record did not reveal, as it did in *Powers,* that the structure was almost always secured during movement and that the actual distance the structure moved was minimal. *See Buna v. Pacific Far East Line,* 441 F.Supp. at 1360 (paint float moved around ship

being painted while carrying men and painting supplies). *Cf. Fleming v. Port Allen Marine Serv.,* 552 F.Supp. at 27 (work float used exclusively within shipyard); *Mayfield v. Wall Shipyard,* 510 F.Supp. at 605 (work pontoon used exclusively in shipyard; never moved with men on it).

**33.** In other cases, we have upheld determinations that special use structures are vessels notwithstanding their dissimilarity to conventional vessels. All of these structures are distinguishable from the work punt, however, because they were designed or used for navigation. *Accord Hicks v. Ocean Drilling & Exploration,* 512 F.2d at 817 (submersible oil storage facility with galley and crew quarters; sunk in mud floor of Gulf of Mexico but designed to be raised for scraping and repair and to be moved to another site); *Producers Drilling Co.,* 361 F.2d at 432 (submersible drilling barge designed to transport drilling equipment; has a hull, navigational instruments, pumps and sea cocks and had been

834

lar inference can not be drawn from the instant facts. The work punt's function "is that of a tool, not a vessel." *Fox v. Taylor Diving & Salvage*, 694 F.2d at 1354.

## V. Conclusion.

We find no error in the district court's conclusion that the record in this case could not support a finding that the work punt was a Jones Act vessel. Accordingly, we affirm the summary judgment below.

AFFIRMED.

towed considerable distance across navigable waters); *Offshore Co. v. Robison*, 266 F.2d at 769 (mobile drilling barge with living quarters, galley, life rafts, raked bow, anchors, navigational aids; towed from one well location in Gulf of Mexico to another).